**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

MAMI CHELO FOUNDATION; ANDREW FREE,

                Plaintiffs,

    v.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. CUSTOMS AND BORDER PROTECTION; AND FEDERAL BUREAU OF INVESTIGATION,

                Defendants.

Case No. 1:26-cv-00637

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

---

### Preliminary Statement

1.      Deaths in ICE custody reached an all-time high in 2025. At the same time, ICE stopped providing affirmative information about deaths in its custody, leaving FOIA as one of the only vehicles by which the public can access this information.

2.      Cristian Dumitrascu was a 50-year-old father of three from Romania who died in the custody of Defendant U.S. Immigration and Customs Enforcement ("ICE") on March 5, 2023. ICE confined Mr. Dumitrascu inside the Otay Mesa Detention Center ("OMDC"), in San Diego, California, which is operated for profit by a publicly traded, privately owned prison contractor, CoreCivic.

3.      Mr. Dumitrascu was dropped from his top bunk—a fact neither CoreCivic nor ICE has publicly disclosed or acknowledged.

4.      Mr. Dumitrascu's death is not an outlier. His is one of the many deaths of people in ICE custody, which reached their highest level in two decades in Fiscal Year

1

2025, and which have alarmingly and horrifically increased over the past decade. ICE in-custody deaths have provoked significant and widespread public outcry for change, reform, and even abolition of ICE's deadly detention system. Mr. Dumitrascu's death is thus part of a larger systemic breakdown of the federal government's immigration detention program.

5.    This is why Mr. Dumitrascu's case has become a significant part of a broader effort to prevent additional deaths under ICE's watch, including widespread efforts by Plaintiff Mami Chelo Foundation ("Mami Chelo") to inform the public about these issues and advocate for changes in the federal detention system.

6.    This action is brought pursuant to the Freedom of Information Act ("FOIA" or the "Act"), 5 U.S.C. § 552, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, to obtain improperly withheld records concerning Mr. Dumitrascu's untimely death, records pertaining to the federal government's response to Mr. Dumitrascu's death, and records generally concerning the in-custody deaths of other persons detained by ICE. Pursuant to various FOIA requests, Plaintiffs seek records from Defendants ICE, U.S. Customs and Border Protection ("CBP"), and Federal Bureau of Investigation ("FBI") (together, "Defendants"). Defendants have failed to adequately acknowledge Plaintiffs' various FOIA requests, as required by law, and have otherwise failed to adequately respond to Plaintiffs' FOIA requests, in violation of the Act.

7.    Plaintiffs seek a declaration that Defendants have improperly withheld records that will shed light on the circumstances surrounding Mr. Dumitrascu's death

and similar abuses at ICE detention centers, and injunctive relief requiring Defendants to immediately process and release the requested records.

8.    Plaintiffs litigated a related dispute over a different set of FOIA requests to ICE and U.S. Department of Homeland Security Office of the Inspector General ("DHS OIG") seeking records related to Mr. Dumitrascu's death. *See Mami Chelo et al. v. Immigr. & Customs Enf't et al.*, 1:25-cv-02546-PAE (S.D.N.Y. 2025). A stipulation and order of settlement and dismissal was entered in that case on November 24, 2025. *Id.*, ECF No. 31.

## JURISDICTION AND VENUE

9.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 552(a)(4)(B). Plaintiffs' request for declaratory and other relief is properly subject to this Court's subject-matter jurisdiction pursuant to 5 U.S.C. § 552(a)(4)(F) and 28 U.S.C. §§ 1331, 2201(a), and 2202.

10.    Venue is proper within this district under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 1391(b)(1), (b)(2), and (e)(1).

11.    Plaintiffs have constructively exhausted all administrative remedies in connection with their FOIA requests, as detailed below.

12.    Because Plaintiffs bring this action after constructively exhausting administrative remedies, this Court's jurisdiction is based on 5 U.S.C. § 552(a)(4)(B) and 5 U.S.C. § 552(a)(6)(C)(i).

13.    Under the latter provision, this Court may retain jurisdiction and allow Defendants additional time to complete the processing of Plaintiffs' FOIA requests if, and only if, the government can demonstrate exceptional circumstances exist ***and*** due

diligence in responses to Plaintiffs' requests. Because Defendants can demonstrate neither, this Court has jurisdiction to declare unlawful the agencies' withholdings and order immediate production of records unlawfully withheld.

14.    Congress passed the Freedom of Information Act, 5 U.S.C. § 552, in 1966 "to establish a general philosophy of full agency disclosure," S. Rep. No. 89–813, at 3 (1965), and "to assure the availability of Government information necessary to an informed electorate," H.R. Rep. No. 89–1497, at 12 (1966), 1966 U.S.C.C.A.N. 2418, 2429.

15.    The statute provides that, subject to certain enumerated exemptions for classified documents, agency personnel and medical files, confidential financial information, and the like (5 U.S.C. §§ 552(b)(1)–(9)), federal agencies generally must make their internal records promptly available to the public upon request. *Id.* § 552(a)(3)(A).

16.    As the Supreme Court has recognized, FOIA's disclosure regime operates "to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).

## PARTIES

17.    Plaintiff Mami Chelo is a 501(c)(3) non-profit organization based in New York, New York. Mami Chelo's mission is to inform the public about the immigration process and to assist individuals and communities who are attempting to participate in the lawful immigration system.[1] Mami Chelo was appointed by Mr. Dumitrascu's family following his death to serve as their attorney-in-fact for the recovery of records

---

[1] Mami Chelo Foundation, https://mamichelo.org/.

relating to his treatment in the immigration detention system. In addition, consistent with its mission, Mami Chelo has commissioned an independent analysis of the records it obtained, which will be published and widely disseminated amongst stakeholders and communities, to assess procedural violations, standards violations, and determine whether the quality of care he received was appropriate.

18.    Plaintiff Andrew Free is a lawyer, scholar, freelance investigative journalist, researcher, and organizer who writes and publishes stories[2] and contributes his FOIA research to reports about deaths in ICE custody and the conditions that produce them. He publishes a regular newsletter informing the public about deaths in DHS custody and the government's transparency practices[3] and is regularly cited or quoted in media outlets covering immigration detention issues,[4] in part as a result of the thousands of records he has collected and published through hundreds of FOIA

---

[2] *See generally*, Andrew Free, Muck Rack (last visited January 23, 2026) https://muckrack.com/andrew-free.

[3] *See* Andrew Free, Detention Kills (last updated January 23, 2026) www.detentionkills.substack.com.

[4] *See, e.g.*, Billal Rahman, *Minneapolis ICE Detainee Dies in Custody in Texas*, Newsweek (Jan. 19, 2026), https://www.newsweek.com/minneapolis-ice-detainee-dies-custody-texas-11380321; Douglas MacMillan, *Medical Examiner Likely to Classify Death of ICE Detainee as Homicide, Recorded Call Says*, Washington Post (Jan. 15, 2026), https://www.washingtonpost.com/immigration/2026/01/15/ice-detention-death-homicide/; Isabel Del Mastro et al., *ICE Inspections Plummeted as Detentions Soared in 2025*, POGO Investigates (Jan. 12, 2026), https://www.pogo.org/investigates/ice-inspections-plummeted-as-detentions-soared-in-2025; Emma Goldberg, *'People Are Losing Hope' Inside ICE Detention Centers*, New York Times (Sept. 16, 2025) https://www.nytimes.com/2025/09/16/health/ice-homeland-security-immigration-detention.html; Rachel Uranga, *Immigrants Decry Conditions at Former Prison ICE's Largest Detention Center in California*, The Los Angeles Times (Sept. 29, 2023) https://www.latimes.com/california/story/2025-09-29/detainees-protest-at-californias-largest-and-newest-immigration-detention-center.

requests over the past decade. ICE has repeatedly identified Mr. Free as a representative of the news media and filer of "significant FOIA requests" since at least 2022.[5]

19.     Mr. Free was engaged by Mami Chelo to conduct the civil society investigation into Mr. Dumitrascu's death.

20.     Defendant ICE is an agency within the meaning of 5 U.S.C. § 551(1). ICE has possession, custody, and control of records responsive to Plaintiffs' FOIA requests.

21.     Defendant FBI is an agency within the meaning of 5 U.S.C. § 551(1). FBI has possession, custody, and control of records responsive to one of Plaintiffs' FOIA requests.

22.     Defendant CBP is an agency within the meaning of 5 U.S.C. § 551(1). CBP has possession, custody, and control of records responsive to one of Plaintiffs' FOIA requests.

## STATEMENT OF FACTS

### Mr. Dumitrascu's Detention

23.     On February 22, 2023, CBP arrested Mr. Dumitrascu near the Otay Mesa Port of Entry, in California, for his alleged involvement in noncitizen alien smuggling activity and for illegally entering the United States on September 1, 2019.

---

[5] *See, e.g.*, Weekly FOIA Report for Mar. 31, 2025, U.S. Dep't of Homeland Security at 8, 70, 130, 164  https://www.dhs.gov/sites/default/files/2025-07/25_0731_PRIV_Chief_FOIA_Officers_Weekly_Report_March_31_25_to_June_30_25.pdf (DHS began affirmatively publishing these Reports, which Mr. Free exposed the existence of through a prior FOIA request, pursuant to 5 U.S.C. § 552(a)(2) following several prior releases to Mr. Free in response to his FOIA requests, *see* https://www.muckrock.com/foi/united-states-of-america-10/dhs-significant-foia-activity-190417/).

6

24.    On February 23, 2023, CBP charged Mr. Dumitrascu with violating Section 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA"), as a noncitizen present in the United States without an immigrant visa or other valid entry documents, and issued him a Notice to Appear, Form I-862.

25.    CBP's national standards on transport, escort, and detention and search ("TEDS") state that individuals should not be held in CBP custody for more than 72 hours in hold rooms or holding facilities.[6]

26.    In violation of this standard, CBP did not transfer Mr. Dumitrascu into ICE custody until March 1, 2023.

27.    The minority staff of the U.S. Judiciary Committee released a report on January 24, 2025 concluding that systemic problems at CBP hold facilities include that they are chronically understaffed and oversight is lacking:

> Whistleblowers and oversight offices, such as the DHS Office of Inspector General (OIG) and DHS Office of Civil Rights and Civil Liberties (CRCL), have attributed inadequate medical care in CBP facilities to, among other factors, understaffing, an inadequate electronic medical records system, and a lack of clarity related to roles and responsibilities in the delivery of medical care. In addition to inadequate medical care, oversight entities have highlighted dangers associated with longer stays in CBP custody. The length of time in custody may exacerbate existing medical care needs, create additional challenges for medical staff attending to the needs of large numbers of migrants, and create dangerous and untenable

---

[6] U.S. Customs and Border Protection, Fiscal Year 2023 Report to Congress, "Short Term Detention" (Jan. 11, 2023), https://www.dhs.gov/sites/default/files/2024-03/2024_0111_cbp_short_term_detention.pdf.

conditions in CBP facilities that were not designed for long-term detention.[7]

28.    On March 1, 2023, CBP transferred Mr. Dumitrascu to ICE Enforcement and Removal Operations ("ERO"). ERO detained Mr. Dumitrascu at OMDC pending a hearing before an immigration judge.

29.    That day, a registered nurse ("RN") completed Mr. Dumitrascu's initial intake screening and documented mildly elevated blood pressure of 135/74 millimeters of mercury, and slightly low heart rate of 59 beats per minute. The nurse also noted Mr. Dumitrascu's self-reported history of hepatitis B for ten years and use of medications. The nurse cleared Mr. Dumitrascu for general population with an appointment to see an advanced practice provider ("APP") the next day.

30.    Mr. Dumitrascu's medical records reflect that although he stated he had been taking medication for Hepatitis B, he received no medication at OMDC.

31.    Moreover, although the records from March 1, 2023 state that Mr. Dumitrascu spoke only Romanian, and his initial health assessment was conducted with a Romanian interpreter, other records state that he spoke English.[8]

32.    According to ICE, on March 3, 2023, an APP completed Mr. Dumitrascu's initial health assessment, and documented that Mr. Dumitrascu denied having any past medical or mental health history, illicit drug use, hospitalizations, or allergies.

---

[7] Judiciary Minority Staff Report, "The Failure to Provide Adequate Care to Vulnerable Individuals in CBP Custody" (Jan. 24, 2025), https://www.judiciary.senate.gov/imo/media/doc/FINAL%20CBP%20Medical%20Care%20Report.pdf.

[8] Inmate Condensed Chart Report, pg. 5, https://www.documentcloud.org/documents/25502779-dumitrascu-cristian-6115668-10jul2024-09-45-48-1/.

33.     However, Mr. Dumitrascu was referred for a number of diagnostic panels based on his elevated blood pressure.

34.     Two days later, Mr. Dumitrascu died. No physician reviewed Mr. Dumitrascu's initial physical exam until nearly two months after he died.

**Mr. Dumitrascu's Untimely Death**

35.     On March 5, 2023, CoreCivic staff dropped Mr. Dumitrascu from his top bunk.

36.     The mortality review regarding his death found that OMDC delayed initiating CPR for 6 minutes, calling 911 for 9 minutes, and initiating the Automated External Defibrillator ("AED") for 16 minutes. The mortality review determined that these delays likely contributed to his death.[9]

37.     According to the mortality review, which was completed by a Mortality Review Committee (MRC):

> [T]he care OMDC provided Mr. [Dumitrascu] deviated beyond safe limits of practice. In addition, the MRC suspects, but could not conclude without an autopsy report, the care OMDC provided Mr. [Dumitrascu] directly contributed to his death.
>
> Specifically, the MRC determined the following: 1) OMDC staff deviated from Core Civic Emergency Response policy; 2) OMDC staff delayed CPR delivery during the emergency response; 3) OMDC staff delayed AED use during the emergency response; 4) OMDC staff did not secure the scene; 5) OMDC's health assessment notes lack defined parameters for areas assessed; 6) OMDC staff lacked the proper CPR technique, application, and skill; and 7) OMDC staff made a poor decision during the emergency response by moving Mr.

---

[9] U.S. Immigration and Customs Enforcement, Report of Findings - Mortality Review Cristian Dumitrascu, A236 302 355 (May 12, 2023), https://www.documentcloud.org/documents/25472204-dumitrascu-mortality-review-2024-icfo-28664-001/https://cdn.muckrock.com/foia_files/2024/12/30/8289411-20241230085643122.zip.

[Dumitrascu] from the scene instead of remaining in place and prioritizing chest compression delivery.

38.     According to the mortality review, on March 5, 2023, at 12:03 a.m., a custody officer announced a medical emergency via radio in Mr. Dumitrascu's housing unit (K pod).

39.     Two minutes later, at 12:05 a.m., one member of the OMDC health staff responded to Mr. Dumitrascu's medical emergency. According to the mortality review, Mr. Dumitrascu was in agonal breathing and snoring loudly.

40.     At 12:07 a.m., OMDC health staff responded with a wheelchair and oxygen tank. An RN found Mr. Dumitrascu pulseless, unresponsive, in agonal breathing, snoring with foamy saliva around the corner of his mouth, and lying on his left side on the top bunk.

41.     At 12:10 a.m., additional health staff responded to the unit with a gurney, emergency bag, and AED.

42.     At 12:13 a.m., staff transferred Mr. Dumitrascu onto a gurney, instructed custody staff to call 911, and administered oxygen via a non-rebreather mask at 15 liters.

43.     At 12:14 a.m., the responding staff initiated CPR.

44.     At 12:15 a.m., the responding staff transported Mr. Dumitrascu to an urgent care room, applied the AED (no shock recommended), continued CPR for an unknown duration, and delivered oxygen via bag valve mask 15L.

45.     At 12:18 a.m., health staff delivered an AED-recommended shock and continued CPR for an unknown duration.

46.    At 12:19 a.m., health staff administered 0.4 milligrams of naloxone intranasally.

47.    At 12:20 a.m., Mr. Dumitrascu remained pulseless and showed no sign of spontaneous breathing. The health staff continued CPR for an unknown duration and an RN documented Mr. Dumitrascu's elevated blood glucose level of 126 milligrams per deciliter.

48.    At 12:24 a.m., responding staff transported Mr. Dumitrascu to OMDC's compound, and continued CPR.

49.    At 12:30 a.m., San Diego Fire-Rescue Department ("SDFD") paramedics arrived at OMDC, assumed Mr. Dumitrascu's care, continued CPR, and administered advanced cardiac life support medications.

50.    At 1:02 am, a Sharp Grossmont Hospital ("SGH") physician, in La Mesa, California, instructed SDFD paramedics to stop CPR and pronounced Mr. Dumitrascu deceased.

51.    At 1:29 a.m., SDFD paramedics departed OMDC without Mr. Dumitrascu's body.

52.    At 2:40 a.m., OMDC custody staff referred Mr. Dumitrascu's body to the San Diego Medical Examiner's Office ("SDMEO").

53.    On March 6, 2023, at 11:28 a.m., SDMEO representatives transported Mr. Dumitrascu's body from OMDC to the San Diego County morgue.

54.    In sum, CoreCivic personnel delayed calling 911 for at least 12 minutes after learning Mr. Dumitrascu was in medical distress, and for at least 9 minutes after discovering him pulseless. An incident report from Cal Fire reveals OMDC did not call

911 until 12:15 a.m. Two units arrived on-site in 8 and 10 minutes, respectively, but did

not take over CPR until 12:30 a.m.

55. A 911 call record Mami Chelo obtained from the San Diego Sheriff's

Department showed CoreCivic did not call until 3:25 a.m.—more than two hours after

Mr. Dumitrascu was pronounced dead. Even after CoreCivic called the Sheriff's Office

to come get Mr. Dumitrascu's body, the agency which would be responsible for

investigating his death remained unclear.

56. According to the mortality review, the following were the weaknesses in

the emergency response:

- The responding custody staff did not immediately recognize the need to check for a pulse or initiate CPR because "they saw Mr. [Dumitrascu] was breathing."

- The responding health staff did not respond to the scene with a mobile gurney containing the emergency kit, backboard, and AED.

- The responding custody staff relied solely on health staff to bring an AED to the medical emergency.

- The responding staff did not use an AED until approximately 16 minutes after discovering Mr. [Dumitrascu] was pulseless.

- The responding staff did not call 911 until nine minutes after discovering Mr. [Dumitrascu] was pulseless.

- Based on the video footage and witness testimonies, after transferring Mr. [Dumitrascu] to the gurney, the responding staff lacked clear communication and a plan for cohesively caring for Mr. [Dumitrascu]. At the shift captain's request, the responding staff initiated CPR six minutes after discovering Mr. [Dumitrascu] did not have a pulse.

- The responding staff did not administer chest compressions during Mr. [Dumitrascu's] transport from his cell to the corridor.

- The responding staff used improper chest compression technique during Mr. [Dumitrascu's] transport from the corridor to the urgent care room and OMDC's compound.

● The responding staff did not participate in a debriefing after the emergency response.

Mortality Review at 5.

57.    Importantly, the mortality review provides a different account of the events than was presented in the Detainee Death Report and several key details described in the mortality review were absent from the Detainee Death Report. For instance, the Detainee Death Report does not discuss the 6-minute delay in CPR initiation after medics discovered that Mr. Dumitrascu had no pulse, the 9-minute delay in calling 911, the improper CPR technique administered while Mr. Dumitrascu was being transported, or the lack of chest compressions when Mr. Dumitrascu was initially moved from his cell to the corridor of the detention center.[10]

58.    Because it has not been made public, it is not clear whether the Detainee Death Review—which Plaintiffs sought in one of the requests at the center of this action—contains the same or similar findings as the mortality review.

59.    However, there are facts showing that Mr. Dumitrascu was actually dropped from his top bunk—a fact not disclosed to ICE or reflected in either the autopsy or the mortality review.

60.    At least seven residents of the housing pod who watched Mr. Dumitrascu die reported to Mami Chelo in affidavits that Mr. Dumitrascu was dropped from the top bunk. A few of them heard shouting about ten minutes before midnight, asking officers for help. Help arrived, with no apparent urgency, some five to ten minutes later.

---

[10] *Compare* Mortality Review, *supra* n. 9 *to* U.S. Immigration and Customs Enforcement, Detainee Death Report: Dumitrascu, Christian, https://www.ice.gov/doclib/foia/reports/ddrCristianDumitrascu.pdf.

61.     The witnesses said that after Mr. Dumitrascu was finally placed on the gurney and rolled out, he was not breathing.

62.     The men who saw the nurses and guard trying and failing to lower Mr. Dumitrascu off the top bunk tried to help them, but the guard and nurses would not allow them inside.

63.     Despite the fact that *all of the witnesses* said they heard or watched the nurses drop Mr. Dumitrascu to the floor, face down, this detail was absent from all of the public investigative records about Mr. Dumitrascu's death.

**Significant Public Interest**

64.     Mr. Dumitrascu's death drew significant public outcry and media attention.[11]

65.     Not only has Mr. Dumitrascu's death garnered significant public interest, but it is unfortunately another horrific example of a widespread issue of repeated in-custody deaths of persons detained by ICE.[12]

---

[11] *See, e.g.*, *Family Members and Advocates Demand Answers from ICE on the Death of Father in their Custody*, Detention Watch Network (Mar. 9, 2023), https://www.detentionwatchnetwork.org/pressroom/releases/2023/family-members-advocates-demand-answers-ice-death-father-their-custody; Caleb Lunetta, *Romanian Citizen Detained by ICE Agents Dies at Otay Mesa Detention Center*, The Brunswick News (Mar. 7, 2023), https://thebrunswicknews.com/romanian-citizen-detained-by-ice-agents-dies-at-otay-mesa-detention-center/article_fb0885bc-e5e6-5a78-8095-7461d7fd2ef5.html.

[12] *See, e.g.*, Cathrin E. Shoichet, *The Death Toll in ICE Custody is the Highest It's Been in 15 Years*, CNN (Sept. 30, 2020), https://www.cnn.com/2020/09/30/us/ice-deaths-detention-2020/index.html; Grace Vitaglione & Sammy Sussman, *Families, Activists, ACLU Question ICE's Accounting of Deaths in Detention*, IRW: Investigative Reporting Workshop (Nov. 15, 2021), https://investigativereportingworkshop.org/investigation/dying-in-silence/.

66.    Mr. Dumitrascu's death is not an outlier. Over the past decade, there has been an increasing number of ICE in-custody deaths at detention facilities like OMDC. This pattern is alarming and has provoked widespread public outcry for change, reform, and even abolition of ICE's deadly detention system.

67.    Mr. Dumitrascu's death has become another horrifying example of a larger systemic breakdown of the federal government's detention program. Deaths in ICE custody are on the rise, which is why Mr. Dumitrascu's case is a significant part of a broader effort to prevent additional deaths under ICE's watch.

68.    At least 29 people died in ICE custody in 2025 alone. The rate of deaths in ICE custody has been climbing for the past several years.[13] Congressional requirements in the 2018 DHS Appropriations Bill mandate that ICE disclose certain information about each person who dies in its custody. Since the end of the lapse in federal appropriations in November 2025, ICE has ceased even publishing these reports. As a result, additional information about these deaths is requested through FOIA.[14]

69.    In particular, many requesters (including Plaintiffs) have sought the Detainee Death Review that ICE prepares after every death in its custody.

70.    The records sought by Plaintiffs' FOIA requests, including the Detainee Death Review, are critical to informing the public about the process by which the U.S. government detains immigrants and thereafter ensures the safety and welfare of

---

[13] *See Detainee Death Reporting*, U.S. Immigration and Customs Enforcement (last accessed January 23, 2026), https://www.ice.gov/detain/detainee-death-reporting.

[14] *Chief FOIA Officer Weekly Reports*, Dep't of Homeland Security (last accessed January 23, 2026), https://www.dhs.gov/chief-foia-officer-weekly-reports (showing requests and litigation designated as "significant" and reported to DHS leadership frequently involve demands for information about deaths in ICE custody).

persons in its custody. These records also inform the public's significant interest in their government's decisions concerning the allocation and use of U.S. tax revenues for the detention of non-citizens.

71.    Despite, or perhaps because of, the critical importance of these records and similar records requested in other cases, ICE has a pattern and practice of unlawfully delaying requests for death information for months or even years.[15] CBP also has a pattern and practice of violating FOIA's statutory deadlines.[16] The FBI does too.[17] News outlets and reporters with outstanding FOIA requests to ICE and CBP make clear that this pattern and practice is not just limited to requests for information

---

[15] *See, e.g., Mami Chelo et al. v. Immigr. & Customs Enf't et al.*, No. 1:25-cv-02546-PAE (S.D.N.Y. 2025) (Plaintiff had to file suit against ICE to obtain its records regarding noncitizen death in custody from ICE); *Am. Civil Liberties Union of Penn. v. Immigr. & Customs Enf't*, No. 2:24-cv-05675 (E.D. Pa. 2024) (same); *Rocky Mountain Immigr. Advocacy Network v. Immigr. & Customs Enf't*, No. 1:23-cv-02359 (D. Colo. 2023) (same); *Transgender L. Ctr. v. Immigr. & Customs Enf't*, 46 F.4th 771 (9th Cir. 2022) (same); *Am. Civil Liberties Union of Colorado v. Immigr. & Customs Enf't*, 1:19-cv-01036 (D. Colo. 2019) (same); *Owen v. Immigr. & Customs Enf't*, 2:22-cv-0050 (C.D. Cal. 2022) (same).

[16] *Mora v. U.S. Customs & Border Prot.*, Civil Action No. 24-3136 (BAH), 2025 U.S. Dist. LEXIS 116591, at *19 (D.D.C. June 18, 2025); *Kruglov v. U.S. Customs & Border Prot.*, Civil Action No. 22-260 (RDM), 2024 U.S. Dist. LEXIS 176668, at *1 (D.D.C. Sep. 30, 2024); *Council on Am.-Islamic Relations-Wash. v. U.S. Customs & Border Prot.*, 492 F. Supp. 3d 1158, 1162 (W.D. Wash. 2020); *Davis Wright Tremaine LLP v. U.S. Customs & Border Prot.*, No. C19-334 RSM, 2020 U.S. Dist. LEXIS 105074, at *6 (W.D. Wash. June 16, 2020).

[17] *Bernegger v. FBI Field Office of Jackson*, No. 3:12CV63 HTW-LRA, 2013 U.S. Dist. LEXIS 34586, at *6 (S.D. Miss. Feb. 21, 2013); *Am. Ctr. for Law & Justice v. FBI*, 470 F. Supp. 3d 1, 6 (D.D.C. 2020); *Judicial Watch, Inc. v. United States DOJ*, 293 F. Supp. 3d 124, 126 (D.D.C. 2018); *Reporters Comm. for Freedom of the Press v. FBI*, 877 F.3d 399, 401 (D.C.C.A. 2017).

about deaths in custody.[18] Indeed, reporters and outlets say that getting a substantive response to FOIA requests directed at these agencies functionally requires litigation in federal court.[19] This reality undermines the "core purpose of the FOIA, which is contributing significantly to public understanding *of the operations or activities of the government*." *United States Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 495 (1994) (internal quotation marks omitted) (emphasis in original).

72.     It is well-established that "public awareness of the government's actions is 'a structural necessity in a real democracy,'" and that "[t]imely awareness is equally necessary because 'stale information is of little value.'" *Am. Oversight v. United States Dep't of State*, 414 F. Supp. 3d 182, 186 (D.D.C. 2019) (citing *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004) and *Payne Enters. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988)). Therefore, delays in processing a FOIA request may "'cause irreparable harm,' but typically only in 'rare FOIA cases . . . involving ongoing proceedings of national importance.'" *Brennan Ctr. for Justice at NYU Sch. Of Law v. Dep't of Commerce*, 498 F. Supp. 3d 87, 101 (D.D.C. Oct. 20, 2020) (quoting *Ctr. for Pub. Integrity v. Dep't of Def.*, 411 F. Supp. 3d 5, 11–13 (D.D.C. 2019)).

## DEFENDANTS' UNLAWFUL FAILURE TO RESPOND TO PLAINTIFFS' FOIA REQUESTS

### FOIA Requests Regarding Cristian Dumitrascu

### *First FOIA Request: ICE*

---

[18] Dave Levinthal, *ICE May Be Breaking the Law to Stonewall Reporters*, Columbia Journalism Review (Sept. 22, 2025), https://www.cjr.org/analysis/ice-cbp-dhs-journalism-foia.php.

[19] *Id.*

73.     On April 3, 2024, Plaintiff Andrew Free sent a FOIA request to ICE for the Detainee Death Review (DDR) for Cristian Dumitrascu. ICE received this request on April 3, 2024, and acknowledged receipt on April 9, 2024, assigning Reference No. 2024-ICFO-28663. ICE informed Mr. Free that it would "invoke a 10-day extension for [his] request" because it sought "numerous documents that will necessitate a thorough and wide-ranging search."

74.     Mr. Free followed up on this request on July 8, 2024, October 7, 2024, and January 6, 2025 but received no response.

75.     On January 6, 2025, Mr. Free appealed ICE's "failure . . . to provide a statutorily required 'determination,' . . . the failure to supply an estimated date of production, and the failure to make records responsive to this request promptly available." Mr. Free also requested expedited processing of his appeal because of the "urgent need to inform the public of actual government contractor wrongdoing."

76.     On January 30, 2025, ICE acknowledged receipt of Mr. Free's appeal and assigned it number 2025-ICAP-00097. It noted that "there may be some delay in resolving this matter" because of ICE's backlog of appeals.

77.     On February 10, 2025, ICE said it had assigned Mr. Free's request to a processor who was reviewing it.

78.     On February 24, 2025, ICE sent Mr. Free a response to his appeal saying that it was remanding the appeal to the ICE FOIA Office to complete the processing of the request. The letter stated: "The ICE FOIA Office will provide a direct response to you."

18

79.     Mr. Free still has not received a response to this request from the ICE FOIA Office and, to date, ICE has not produced any documents in response to the First FOIA Request.

***Second FOIA Request: ICE***

80.     On January 2, 2025, Mr. Free sent another FOIA request to ICE on behalf of Mami Chelo Foundation for (1) "All records constituting a Corrective Action Plan created for the ICE Otay Mesa Detention Center (OMDC) in response to the findings and recommendations of the ICE Health Services Corps (IHSC) Mortality Review Committee's May 12, 2023, Mortality Review of the death of Cristian Dumitrascu on March 5, 2023, inside OMDC"; (2) "A record, if any, reflecting ICE's determination not to impose a corrective action plan in response to the IHSC Mortality Review Committee's findings and recommendations"; and (3) "Any Contract Discrepancy Report and relating correspondence between ICE and CoreCivic reflecting a deduction or withholding of invoiced funds by ICE based on the findings of IHSC's Mortality Review Committee that Core Civic staff fell short of contractually required standards in Mr. Dumitrascu's care and the associated facility response."

81.     Mr. Free also submitted a request for expedited processing and a sworn statement affirming that this request satisfied the requirements for expedited processing, to the best of his knowledge. Mr. Free explained that there was "an urgency to inform the public about the circumstances of Mr. Dumitrascu's death" that justified prioritizing his request.

82.     On January 7, 2025, ICE acknowledged receipt of Mr. Free's request and assigned it number 2025-ICFO-12431. It noted that "[d]ue to the increasing number of

FOIA requests received by this office, we may encounter some delay in processing your request." In addition, ICE denied Mr. Free's request for expedited processing, asserting that Mr. Free's request had "failed to demonstrate a particular urgency to inform the public about the government activity involved in the request beyond the public's right to know about government activity generally." ICE also denied Mr. Free's request for a fee waiver.

83.     On January 9, 2025, Mr. Free appealed the denial of his fee waiver and request for expedited processing.

84.     On May 16, 2025, ICE sent Mr. Free an email regarding his request with the subject: "ICE FOIA 2025-ICFO-12431 Clarification Request." The email stated that it was in regards to Mr. Free's request, which it quoted in its entirety. That email did not include any actual clarification request or any information about ICE's progress on responding to Mr. Free's request.

85.     Finally, on August 26, 2025, ICE responded that "no records responsive to [Plaintiffs'] request were found."

86.     On August 27, 2025, Mr. Free appealed the determination that no records exist. Mr. Free received a notice from ICE on September 10, 2025 assigning his appeal number 2025-ICAP-00446.

87.     On October 3, 2025, Mr. Free received a letter determination on his appeal. That determination affirmed the denial of Mr. Free's request for expedited processing. It provided several reasons for that denial. First, notwithstanding his claims that ICE detention contracts with CoreCivic have involved a high rate of in-custody deaths, Mr. Free "did not provided [sic] evidence to demonstrate that standard

processing of this request would pose an imminent threat to the life or physical safety of any specific individual."

88.     Second, it found that Mr. Free "failed to demonstrate an urgency to inform the public about a federal government activity because the second factor is not satisfied." The letter did not explain *how* or *why* the second factor was "not satisfied." In addition, the letter concluded without any reasoning that Mr. Free "did not demonstrate that delaying a response would compromise a significant recognized interest."

89.     Third, it concluded that Mr. Free had not made "a showing of a loss of substantial due process rights." Fourth and finally, it found that "there does not appear to be widespread media interest for [sic] the specific documents [Mr. Free was] seeking through this FOIA request."

90.     The letter did not address Mr. Free's statement in his request that he was making the request for expedited processing "based on an urgent need to inform the public about actual or alleged government misconduct, and based on 6 C.F.R. 5.5(e), because preventable deaths in ICE custody constitute a matter of widespread media attention about which there exist questions as to the propriety and legality of the government's actions."

***Third FOIA Request: FBI***

91.     On January 3, 2025, Mr. Free sent a FOIA request to FBI, seeking "records of communication, investigation, or reporting to the FBI's San Diego Field Office or FBI Headquarters from U.S. Immigration and Customs Enforcement" regarding the March 5, 2023 death of Mr. Dumitrascu in ICE custody at OMDC.

92.     Mr. Free's request noted in addition that "[a] record from the San Diego County Sheriff's Office 911 center indicates that agency called off an investigation into the death in custody on the alleged basis that the FBI was conducting the investigation. See page 2 of the SDSO 911 call log here: https://www.documentcloud.org/documents/ 25476387-sheriffs-record-911-call/#document/p2/a2619411."

93.     Mr. Free requested expedited processing and a fee waiver.

94.     On January 13, 2025, Mr. Free received a letter from Michael G. Seidel, Section Chief of the Record/Information Dissemination Section in the Information Management Division of the FBI. The letter stated that Mr. Free's request "did not contain enough identifying information for this office to make a determination regarding the responsiveness of records in our Central Records System." As a result, the letter informed Mr. Free that his request was being "administratively closed." The FBI asked Mr. Free to provide "any additional information that would help locate the records with a reasonable amount of effort." It elaborated: "This might include *the subject's complete name*, date of birth, prior addresses, former employment information, *or any incidents for which you believe the FBI may have investigated the subject*." (emphasis added).

95.     Mr. Free appealed the administrative denial of this request on January 14, 2025, explaining that the request included "the name of the person who died, the date he died, the location he died, the agency in whose custody he died, the field office we suspect his death would have been reported to, . . . the record on which we based that suspicion [, and] a time period for search."

22

96.    On February 13, 2025, the FBI sent Mr. Free a letter advising him that the Bureau had received his administrative appeal and assigned it number A-2025-00873.

97.    The FBI Administrative Appeals bureau chief informed Mr. Free on April 11, 2025 that, "[a]fter carefully considering your appeal, and as a result of discussions between FBI personnel and this Office, I am remanding your request to the FBI for a search for responsive records."

98.    Mr. Free then received a letter on April 15, 2025 stating that the FBI had "opened" his remanded appeal and "will inform you of the results in future correspondence." In addition, the letter explained that Mr. Free's request for a fee waiver was being considered but that his request for expedited processing was being denied, since it determined the request did not include "enough information concerning the statutory requirements permitting expedition." Mr. Free appealed the agency's denial of his request for expedited processing.

99.    On June 23, 2025, Mr. Free received a message saying that the decision on his request for expedited processing "complied with [its] standard procedures, and further action is not required." It did not state whether this communication constituted a decision on Mr. Free's appeal of the agency's denial of his request for expedited processing.

100.    To date, FBI has not produced any documents in response to the Third FOIA Request.

*Fourth FOIA Request: CBP*

101.    Mr. Free filed a request with the United States Customs and Border Protection on January 14, 2025. That request sought "CBP database entries, communications, reports of investigation, or other records pertaining to Cristian Dumitrascu." It also provided the following details: "CBP apprehended Mr. Dumitrascu on or around February 22, 2023, near the Otay Mesa POE for alleged involvement in alien smuggling activity and for allegedly admitting to illegal entry into the U.S. on or around September 1, 2019. Mr. Dumitrascu was apparently in CBP custody from the date of his arrest through March 1, 2023, when ICE took custody. He died five days later at the Otay Mesa Detention Center."

102.    On January 15, 2025, CBP acknowledged receipt of Mr. Free's request and assigned it number CBP-FO-2025-049007 and noted that, "[d]ue to the increasing number of FOIA requests received by this office, we may encounter some delay in processing your request."

103.    Mr. Free followed up with CBP about this request on April 15, 2025 and July 14, 2025.

104.    On August 11, 2025, CBP produced three documents to Mr. Free: (1) a document entitled "Record of Deportable/Inadmissible Alien" with information about Mr. Dumitrascu and his arrest and detention, Exhibit A; (2) a Manifest report documenting a transfer from SDC (presumably Stuart Detention Center in Lumpkin, Georgia that is almost entirely redacted, Exhibit B; (3) a record with biographical information about Mr. Dumitrascu that is otherwise entirely redacted, Exhibit C. Together, CBP produced a total of seven pages.

24

105.    Mr. Free appealed the adequacy of the agency's search and the agency's withholdings on August 12, 2025.

106.    CBP acknowledged his appeal and assigned it number BP-AP-2025-007128 on September 2, 2025, but to date, he has not received any determination about this appeal.

***ICE and FBI's Failure to Respond to the FOIA Requests***

107.    As of the date of this filing – over a year after the initial requests were submitted – neither ICE nor FBI has produced ***any records*** in response to Plaintiffs' First and Second FOIA Requests (together "the FOIA Requests"), in violation of FOIA.

108.    Despite the significant public interest in Mr. Dumitrascu's death as articulated herein, ICE and FBI have failed to (1) notify Plaintiffs of any determination regarding the FOIA Requests, including the full scope of any responsive records the agencies intend to produce or withhold and the reasons for any withholdings, thereby violating the timing requirements of FOIA; and (2) produce all relevant requested records or alternatively demonstrate that the requested records are lawfully exempt from production as required by FOIA.

109.    Plaintiffs have constructively exhausted administrative remedies because ICE and FBI have failed to make a determination in response to the FOIA Requests within the time period required by law.

110.    Plaintiffs have also constructively exhausted administrative remedies with CBP because it has failed to make a determination on the appeal filed on September 2, 2025.

111.    Given these facts, Plaintiffs seek immediate judicial review.

## CLAIMS FOR RELIEF

### COUNT I
### FAILURE TO MAKE DETERMINATION
### VIOLATION OF 5 U.S.C. § 552(a)(6)(A)(i)
### (DEFENDANTS ICE AND FBI)

112.    Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs as if fully set forth herein.

113.    FOIA requires an agency to make a determination within 20 working days after the receipt of a FOIA request. 5 U.S.C. § 552(a)(6)(A)(i). The FOIA statute permits agencies to invoke a ten-day extension with written notice to the requester explaining that "unusual circumstances" warrant an extension. 5 U.S.C. § 552(a)(6)(B)(i); *see also Citizens for Responsibility & Ethics in Washington v. Federal Election Commission ("CREW")*, 711 F.3rd 180, 185 (D.C. Cir. 2013) (Kavanaugh, J.).

114.    "[I]n order to make a 'determination' and thereby trigger the administrative exhaustion requirement, the agency must at least: (i) gather and review the documents; (ii) determine and communicate the scope of the documents it intends to produce and withhold, and the reasons for withholding any documents; and (iii) inform the requester that it can appeal whatever portion of the 'determination' is adverse." *Id.* at 188.

115.    ICE and FBI have failed to make a determination regarding Plaintiff's First and Third FOIA Requests.

### COUNT II
### FAILURE TO PROVIDE AN ESTIMATED DATE OF COMPLETION
### VIOLATION OF 5 U.S.C. § 552(a)(7)(B)(ii)
### (ALL DEFENDANTS)

116.    Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs as if fully set forth herein.

26

117.    To comply with this section of FOIA, Defendants must, at a minimum, complete an initial search, make a determination, and reach an estimate.

118.    Defendants must establish a telephone line or internet service to provide an estimated date on which the agencies will complete action on the request.

119.    In violation of this statute, Defendants failed to provide an estimated date on which the requests would be completed.

## COUNT III
## FAILURE TO MAKE RECORDS PROMPTLY AVAILABLE
### VIOLATION OF 5 U.S.C. § 552(a)(3)
### (ALL DEFENDANTS)

120.    Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs as if fully set forth herein.

121.    Upon request, an "agency … shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A).

122.    Defendants have violated this provision by failing to make records "promptly available."

## COUNT IV
## PATTERN AND PRACTICE OF VIOLATION OF TIME LIMITS
### VIOLATION OF 28 U.S.C. § 2202
### (ALL DEFENDANTS)

123.    Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs as if fully set forth herein.

124.    Defendants have established a pattern and practice of violating statutory time limits.

125.    Courts have previously granted judgment as matter of law to the family member or representative of someone who died in ICE custody, explaining that "promptly available" "typically would mean within days or a few weeks of a

'determination,' not months or years." *Sierra Club v. U.S. Env't Prot. Agency*, 2018 WL

10419238, at *5 (N.D. Cal. Dec. 26, 2018) (quoting *CREW*, 711 F.3d at 188); *Owen v.*

*U.S. Immigration & Customs Enforcement*, No. 22-cv-0550, 2023 U.S. Dist. LEXIS

234645, at *23 (C.D. Cal. Jan. 12, 2023) ("Courts grant declaratory judgment in the

FOIA context only where there is a practice or policy of delayed disclosure that seems

likely to repeat itself.").

**COUNT V**
**UNLAWFUL WITHHOLDING OF AGENCY RECORDS**
**VIOLATION OF 5 U.S.C. § 552(a)(4)(B)**
**(DEFENDANT ICE)**

126.    Plaintiffs re-allege and incorporate by reference all allegations in the

foregoing paragraphs as if fully set forth herein.

127.    Plaintiffs have a legal right under FOIA to the timely search and release

of responsive, non-exempt agency records responsive to the ICE FOIA Requests.

128.    There is no legal basis for ICE's failure to adequately and timely search

for and release responsive agency records in compliance with FOIA's time limits.

129.    ICE's failure to make reasonable and timely efforts to search for and

release responsive agency records constitutes an unlawful withholding under the Act

that this Court can and should remedy through declaration and injunction.

130.    ICE's failure to initiate an adequate search and substantively respond to

the First and Second FOIA Requests within the timeframe allowed by law violates

FOIA.

131.    Because ICE has failed to comply with the Act's time limits, Plaintiffs

have constructively exhausted their administrative remedies.

132.    Plaintiffs are therefore entitled to injunctive and declaratory relief requiring ICE to promptly make reasonable efforts to search for and produce records responsive to the ICE FOIA Requests.

## COUNT VI
## UNLAWFUL WITHHOLDING OF AGENCY RECORDS
## VIOLATION OF 5 U.S.C. § 552(a)(4)(B)
## (DEFENDANT FBI)

133.    Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs as if fully set forth herein.

134.    Plaintiffs have a legal right under FOIA to the timely search and release of responsive, non-exempt agency records responsive to the FBI FOIA Request.

135.    There is no legal basis for FBI's failure to adequately and timely search for and release responsive agency records in compliance with FOIA's time limits.

136.    FBI's failure to make reasonable and timely efforts to search for and release responsive agency records constitutes an unlawful withholding under the Act that this Court can and should remedy through declaration and injunction.

137.    FBI's failure to initiate an adequate search and substantively respond to the FBI FOIA Request within the timeframe allowed by law violates FOIA.

138.    Because FBI has failed to comply with the Act's time limits, Plaintiffs have constructively exhausted their administrative remedies.

139.    Plaintiffs are therefore entitled to injunctive and declaratory relief requiring FBI to promptly make reasonable efforts to search for and produce records responsive to the FBI FOIA Request.

## COUNT VII
## FAILURE TO CONDUCT ADEQUATE SEARCH FOR RESPONSIVE RECORDS
## VIOLATION OF 5 U.S.C. § 552(a)(3)(C)
## (DEFENDANTS ICE AND CBP)

140.    Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs as if fully set forth herein.

141.    FOIA requires agencies to "make reasonable efforts to search for [requested] records in electronic format." 5 U.S.C. § 552(a)(3)(C).

142.    "[I]n a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA." *Carney v. United States Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994).

143.    "[T]o establish that the search was adequate, the agency must demonstrate that the search was reasonably calculated to discover the requested documents, not perfect." *Brennan Ctr. for Just. v. United States Immigr. & Customs Enf't*, 571 F. Supp. 3d 237, 245 (S.D.N.Y. 2021) (internal quotation marks omitted).

144.    ICE and CBP each failed to conduct a search "reasonably calculated to discover the requested documents" since it identified an implausible number of documents responsive to Plaintiffs' Second (zero documents identified) and Fourth (three short documents identified) FOIA requests, respectively.

## COUNT VIII
## FAILURE TO AFFIRMATIVELY DISCLOSE RECORDS
## VIOLATION OF 5 U.S.C. § 552(a)(2)
## (DEFENDANT ICE)

145.    Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs as if fully set forth herein.

146.    FOIA requires agencies to affirmatively disclose records that, "because of the nature of their subject matter, the agency determines have become or are likely to

become the subject of subsequent requests for substantially the same records."
5 U.S.C. § 552(a)(2)(D)(ii)(I).

147.    Section 552(a)(2)—known as FOIA's "reading room" provision—requires affirmative electronic disclosure of certain records, including those described in 5 U.S.C. § 552(a)(2)(D)(ii)(I) that are subject to repeated requests. *See N.Y. Legal Assistance Grp. v. Bd. of Immigration Appeals*, 987 F.3d 207, 209 (2d Cir. 2021).

148.    The Second Circuit has held that "the remedial provision of FOIA, § 552(a)(4)(B), grants district courts the authority to order injunctive relief to enforce § 552(a)(2), including an order requiring the agency to make records available for public inspection in an electronic reading room." *Id.* at 223.

149.    As described herein, Detainee Death Reviews are virtually always requested when an individual dies in ICE's custody "because of the nature of their subject matter." *See* 5 U.S.C. § 552(a)(2)(D)(ii)(I). Accordingly, ICE has an affirmative obligation to disclose these records since they "have become . . . the subject of subsequent requests for substantially the same records." 5 U.S.C. § 552(a)(2)(D)(ii)(I).

150.    ICE has not complied with its obligation to affirmatively disclose these records, and Plaintiffs seek judicial review of this non-compliance pursuant to 5 § 552(a)(4)(B); *see also N.Y. Legal Assistance Grp.*, 987 F.3d at 223.

151.    ICE has a pattern and practice of failing to comply with its obligations under FOIA. As a result, requesters seeking access to Detainee Death Reviews are required to litigate their FOIA requests in order to obtain access to those vitally important records, which ICE has an obligation to affirmatively disclose.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

     1.     enter judgment on all counts in favor of Plaintiffs and against Defendants;

     2.     declare Defendants' withholdings under FOIA unlawful and enjoin Defendants from continuing to withhold all non-exempt records responsive to the FOIA Requests;

     3.     order Defendants to make a determination as required by FOIA;

     4.     order Defendants to conduct a prompt and adequate search for all records responsive to the FOIA Requests, determine which, if any, portions of such records are exempt, and require Defendants to release the remaining portions of these agency records;

     5.     order Defendants to produce, within 20 days of the Court's order, or by such other date as the Court deems appropriate, all non-exempt records responsive to the FOIA Requests, all segregable records responsive to the FOIA Requests, and indices justifying the withholding of any responsive records withheld under any claim of exemption;

     6.     order Defendant ICE to affirmatively disclose Detainee Death Reviews in all cases of in custody deaths pursuant to 5 U.S.C. § 552(a)(2)(D)(ii)(I);

     7.     award Plaintiffs reasonable costs and attorneys' fees pursuant to 5 U.S.C. § 552(a)(4)(E) and/or 28 U.S.C. § 2412(d)(1)(A); and

     8.     award Plaintiffs such further relief as the Court deems just, equitable, and appropriate.

Dated: January    23, 2026
　　　　New York, NY

POLLOCK COHEN LLP

By: /s/ *Emily Hockett*
Emily Hockett
Adam Pollock
111 Broadway, Suite 1804
New York, NY 10006
(212) 337-5361
Emily@PollockCohen.com